IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **RONNIE L. LUMPKIN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil No. 11-1131-CJP** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Ronnie L. Lumpkin is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

**Procedural History**

Mr. Lumpkin applied for benefits in 2008, alleging disability beginning on August 15, 2007. (Tr. 126, 130). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Gary L. Vanderhoof denied the application on June 18, 2010. (Tr. 13-22). Plaintiff's request for review was denied by the Appeals Council, and the June 18, 2010, decision became the final agency decision. (Tr. 3).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 12.

this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

(1) The ALJ failed to explain why plaintiff was not entitled to a period of disability.

(2) The ALJ's determination of plaintiff's credibility was erroneous.

(3) The ALJ failed to explain why he rejected plaintiff's claims of pain and fatigue in his RFC assessment.

(4) The ALJ failed to consider plaintiff's claim that he cannot work full-time.

(5) The ALJ failed to include limitations in maintaining persistence, pace or concentration in his RFC assessment.

## Applicable Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).**  The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether Mr. Lumpkin was, in fact, disabled during the relevant time period, but whether the ALJ's findings

were supported by substantial evidence; and, of course, whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Vanderhoof followed the five-step analytical framework described above. He found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, and that he was insured for DIB through December 31, 2011. He concluded that plaintiff had severe impairments of back problems and a mood disorder, and that his impairments do not meet or equal a listed impairment. (Tr. 13-17)

The ALJ concluded that plaintiff had the residual functional capacity (RFC) to perform a limited range of work at the sedentary exertional level. The ALJ concluded that plaintiff's statements about his symptoms were not credible to the extent that they conflicted with this RFC assessment. At step 4, the ALJ determined that plaintiff was not able to perform his past relevant

work.  At step 5, relying on the testimony of a vocational expert, he determined that plaintiff was able to do other work that existed in the national economy, such as circuit board touch-up, addresser and surveillance system monitor.  (Tr. 17-22).

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation.  The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff.

**1.**     **Agency Forms**

Mr. Lumpkin was born in 1968 and was 39 years on the alleged date of disability.  (Tr. 154).  In March, 2008, he was 5'9" and weighed 210 pounds.  (Tr. 144).  He said that he stopped working in August, 2007, due to bulging and herniated discs in his lumbar spine.  (Tr. 145).

Mr. Lumpkin has a GED.  He was not in special education classes.  (Tr. 152).  He had worked as a carpenter, crew supervisor for a window installation company, insurance producer, self-employed crew supervisor in construction, warehouse manager and utility technician.  (Tr. 158).

In a Function Report submitted in December, 2008, plaintiff said that he lived with his family.  On a typical day, he drove his kids to school, read or watched t.v., and laid down.  He said that he walked with a cane, had to wear a back brace when he was out of bed, and had to wear a bone stimulator for four hours a day.  (Tr. 214-215).  He said that he was unable to do anything that would put pressure on his back.  (Tr. 215-216).  He had been having problems with depression and cried for no reason at times.  (Tr. 220).

**2.      Evidentiary Hearing- May 6, 2010**

Plaintiff was represented at the hearing by an attorney.  (Tr. 29).

Psychologist Susan Pelzer testified as a medical expert based on her review of the record.  She testified that plaintiff did not have a mental impairment that would result in marked impairments on the "B" criteria.  Referring to the report of a state agency consultant who performed a psychological exam, she noted that he had been diagnosed with "pain disorder associated with both psychologic [sic] factors and general medical condition by history , mood disorder associated with health conditions by history and adjustment disorder NOS."  She testified that, in her opinion, his mental condition caused mild limitation of daily activities, mild to moderate limitation of attention, concentration and pace based on pain, and mild limitation of social functioning.  (Tr. 30-33).

Dorothy Leon, M.D., a specialist in Physical Medicine and Rehabilitation, also testified as a medical expert based on her review of the records.  She testified that his physical condition did not meet or equal a Listing.  She summarized the medical records, which indicate that he had an ankle fusion in the past due to a fracture, which caused him to walk with a limp.  He had back surgery in October, 2008, consisting of a fusion from L2-S1.  He did well with physical therapy after surgery, and his doctor released him, to be seen as needed.  A functional capacity evaluation in March, 2010, put him in the light category.  (Tr. 35-37).  Dr. Leon opined that he could lift 10 pounds occasionally and 5 pounds frequently, stand/walk for 2 out of 8 hours, sit for 6 out of 8 hours, with no climbing ladders, ropes or scaffolds and only occasional stooping and crouching.  (Tr. 37).

Mr. Lumpkin testified that lived with his wife and two children, aged 16 and 13.  His wife

worked. He drove the kids to school, and did a little bit around the house, like rinsing dishes. Sometimes he went to the store. The heaviest thing he could lift was a gallon of milk. He could be on his feet for 15 or 20 minutes. He had to change positions and stand up if he sat for a while. He laid down during the day to relieve his pain. He had medication for pain and muscle spasms, which he took as needed, two or three times a week. (Tr. 40-46). He testified that he could not work full-time at a job like surveillance system monitor because "after the first day I would have to take a [sic] medication just to exist." (Tr. 47). He testified that pain medication did not really do anything for him, but muscle relaxers caused him to be "wiped out" the next day such that he could not even drive. (Tr. 48).

Mr. Lumpkin said that his back pain improved after the surgery for a little bit, then it started getting progressively worse. (Tr. 49).

A vocational expert (VE) testified. The ALJ asked the VE to assume a person who could lift 10 pounds occasionally and 5 frequently, stand or walk 2 out of 8 hours, limited to no ladders, ropes, scaffolds, and only occasional stooping and crouching, with no work at unprotected heights around dangerous machinery and no balancing. He also had mild limitations of daily living and social functioning, and mild to moderate limitation of attention and concentration. The VE testified that such a person would not be able to do plaintiff's past relevant work. However, this person could do sedentary jobs such as circuit board touch up assembler, addresser, and surveillance system monitor. (Tr. 50-52).

**3.     Medical Records**

Mr. Lumpkin was see by Dr. Stynowick at Christian Hospital Pain Management in 2007. On May 10, 2007, Dr. Stynowick noted that Mr. Lumpkin complained of diffuse low back and

leg pain.  He did not have lower extremity numbness or weakness.  His pain began when he fell from a ladder in 2002, but began worsening in February, 2007.  He worked as a carpenter.  He had tried physical therapy and medication.  An MRI was done in March, 2007.  It showed lumbar disc bulges.  Dr. Stynowick did a medial branch nerve block from L-2 to S-1 on May 24, 2007.  (Tr. 246-249).

Plaintiff was treated at the Center for Interventional Pain Management.  He underwent various procedures there, including injection of facet joints in June and July, 2007, nerve root injection in October, 2007, radiofrequency neurolysis (denervation) procedures at L2-L5 in July, 2007 and February, 2008, and injection of his sacroiliac joints in April, 2008. (Tr. 283-284, 325, 356, 359, 366).

Bruce Amble, Ph.D., performed a consultative psychological examination on July 17, 2008.  Plaintiff indicated that he had last worked in August, 2007, and could not go back to work because of his back pain.  He described limited daily activities and said that he often had to sit or lay down because of his back.  Dr. Amble noted that he showed some depressive symptoms with constriction and some flatness of affect.  The diagnostic impression was pain disorder associated with both psychological factors and medical condition, mood disorder associated with health condition and adjustment disorder NOS.  (Tr. 393-396).

Mr. Lumpkin saw Dr. Kee Park, a neurosurgeon on July 3, 2008.  Mr. Lumpkin told Dr. Park that another surgeon had recommend spinal fusion surgery, and he wanted a second opinion.  A recent MRI showed disc herniation at L1-2 and L3-4, with L5-S1 disc collapse.  (Tr. 525-526).  Dr. Park did a discogram which showed that his pain was from the L2-3, L4-5, L5-S1 levels, and probably L3-4 as well.  He recommended an electrothermal angioplasty treatment before doing

surgery.  (Tr. 524, 527).  About three weeks after that procedure, Mr. Lumpkin reported 30 to 40% reduction of his back pain.  (Tr. 522).  However, in September, 2008, he reported that he had felt a popping sensation in his back which aggravated his back pain radiating down into his right leg.  (Tr. 521).  Dr. Fonn, who practiced with Dr. Park, noted in October, 2008, that a new MRI showed degenerative disc disease and moderate to severe lateral canal stenosis at L2 to S1, with compression of the exiting nerve root.  He continued to report incapacitating pain in his back with spasms and pain radiating into his heels, worse on the right.  Dr. Fonn noted that had tried "just about everything," and recommended a four level fusion.  (Tr. 520).  Dr. Fonn did the surgery on October 28, 2008.  (Tr. 516-517).  At the four week follow-up visit, his hardware was in good placement.  Dr. Fonn advanced him to driving, and declared him temporarily disabled so he could get a temporary handicapped tag for his car.  (Tr. 509).

On February 4, 2009, Dr. Fonn noted that plaintiff had good fusion, but was having some spasms.  He recommended physical therapy and a lumbar CT.  (Tr. 689).  A CT on April 3, 2009, showed that the hardware was in good placement and had not failed.  There was a small disc protrusion at L1-L2 which did not cause canal stenosis.  (Tr. 684-685).  On April 15, 2009, plaintiff reported to Dr. Fonn that he was doing very well with his physical therapy.  Dr. Fonn recommended that he continue with therapy and return to the office as needed.  (Tr. 683).

Plaintiff was discharged from physical therapy on May 29, 2009.  He was going back to school and was not returning to construction work.  All goals had been met and his prognosis was excellent.  He was given a home exercise program.  (Tr. 595).

Mr. Lumpkin saw his primary care physician, Dr. Harrison, for high blood pressure and tightness in his chest in March and April, 2009.  There were no notations of back complaints.

(Tr. 650-651, 658-659). However, in September, 2009, Mr. Lumpkin complained to Dr. Harrison of back pain with increased symptoms and spasms. On exam, Dr. Harrison found tenderness and muscle spasms in the lumbosacral spine area. (Tr. 649-650).

Plaintiff returned to physical therapy for one visit on October 2, 2009, complaining of increased back spasms after sitting in class for 3 hours. (Tr. 592- 593).

In March, 2010, a "Fit for Work" evaluation was done at Southern Illinois Healthcare by a physical therapist. Plaintiff told the therapist that his biggest problem was muscle spasms, and he rated his low back pain from 2/10 to 9/10 in the past 30 days. The therapist reported that he tested in the light physical demand level, but had difficulty with all low level tasks such as stooping and kneeling. He also had difficulty with material handling, especially pulling and pushing. (Tr. 701-703).

**4.     RFC Assessments**

Based upon a review of medical records, a state agency consultant completed a Physical Residual Functional Capacity (RFC) Assessment form on June 30, 2008. He opined that Mr. Lumpkin could do work at the light level (lift 20 pounds occasionally, lift 10 pounds frequently, sit for a total of 6 hours a day, stand/walk for a total of 6 hours a day), with other limitations. (Tr. 382-389).

A different state agency consultant assessed plaintiff's RFC after his surgery. In October, 2008, Dr. Gotway opined that Mr. Lumpkin could do a limited range of work at the light level. Dr. Gotway opined that he was able to sit for 6 out of 8 hours, but he was limited to standing/walking for 2 out of 8 hours. He was further limited in ability to push/pull with his legs, and was limited to only occasional postural activities and no balancing, (Tr. 532-539).

M.W. DiFonso, PsyD, completed a Psychiatric Review Technique form on December 28, 2008.[3] (Tr. 540-553). This assessment was based on a review of medical records and not a personal examination. Dr. DiFonso opined that Mr. Lumpkin had an impairment which was not severe. He opined that plaintiff had a mood disorder due to general medical condition, which he categorized as an affective disorder. (Tr. 543). He did not indicate that plaintiff had any type of somatoform disorder. (Tr. 546). A section of the form required him to assess functional limitations with reference to the so-called B Criteria, which are the criteria set forth in paragraph B of the mental disorders Listings. See, 20 C.F.R. Subpt. P. App. 1, §§12.00 et seq. Dr. DiFonso rated his restriction of activities of daily living, difficulties in social functioning and difficulties in maintaining concentration, persistence or pace as "mild." (Tr. 550). Dr. DiFonso stated in the notes that Dr. Amble had examined plaintiff and had diagnosed "mood disorder associated with health condition." (Tr. 552).

**5.    Records not before the ALJ**

The transcript contains medical records which were not before the ALJ and which post-date his decision. See, Tr. 704-727. This evidence was submitted to the Appeals Council after the ALJ rendered his decision, see, Tr. 7, and cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. ***Getch v. Astrue,* 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).**

## Analysis

Plaintiff is correct that the ALJ failed to properly assess his credibility, particularly his

---

[3]The Psychiatric Review Technique form is part of the "special technique" used by the agency in evaluating alleged mental impairments. The special technique is explained in 20 C.F.R. §404.1520a.

his complaints of pain.

ALJ Vanderhoof expressed his credibility findings using the standard language that is often seen in social security decisions. He said that Mr. Lumpkin's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 19). The Seventh Circuit has repeatedly criticized this language, which it has called "meaningless boilerplate." **See, Bjornson v. Astrue, 671 F.3d 640, 644-646 (7th Cir. 2012), and cases cited therein.**

Citing **Richison v. Astrue, 462 Fed. Appx. 622 (7th Cir. 2012)**, the Commissioner correctly points out that the use of the boilerplate language is not necessarily fatal. In that case, the ALJ's credibility determination was affirmed because he explained "which of [plaintiff's] statements he did not credit and why...." **Richison, supra, at 625-626.**

The Commissioner's argument is correct as a general principle, but it does not save the ALJ's decision here. The Seventh Circuit recently reiterated that the ALJ must determine a claimant's credibility by considering the factors set forth in 20 C.F.R. §404.1529(c) and must support his credibility findings with evidence in the record. "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." **Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012)**. Here, in large part, ALJ Vanderhoof based his credibility findings on a perceived lack of support in the medical records. See, Tr. 19. The Commissioner seems to agree; in his brief, he says that, in explaining his credibility determination, the ALJ "discussed the medical evidence in detail (see generally Tr. 16-19). In

addition, the ALJ reasonably discussed other evidence, such as Plaintiff's activities and use of medications. (Tr. 18)." Doc. 25, p. 7.

First, the Court notes that "an ALJ may not discredit testimony of pain solely because there is objective medical evidence to support it." **Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009)**. Yet, that is essentially what the ALJ did here. Based upon his perception that the objective medical evidence established that Mr. Lumpkin "had no further documented problems" after his release from physical therapy, he concluded that the medical records "fail to support the claimant's allegations as credible to the extent alleged." (Tr. 19). However, the ALJ's analysis of the medical evidence is flawed.

The ALJ overlooked medical evidence that documented that Mr. Lumpkin did, in fact, have problems following his release from physical therapy. The ALJ failed to mention the records of his primary care physician. Plaintiff told Dr. Harrison in September, 2009, that he was having back pain with increased symptoms and spasms. Dr. Harrison found tenderness and muscle spasms in the lumbosacral spine area on examination. (Tr. 649-650). Further, plaintiff returned to physical therapy for one visit on October 2, 2009, complaining of increased back spasms after sitting in class for 3 hours. (Tr. 592- 593). This evidence was ignored by both the ALJ and Dr. Leon, the medical expert who testified at the hearing. This evidence undermined the ALJ's conclusion, central to his credibility analysis, that the objective medical evidence established that plaintiff had no documented problems after his release from physical therapy in May, 2009. In addition, the ALJ said that "His last examination on March 16, 2010, was unremarkable and no further treatment was recommended." (Tr. 19). However, the "examination" on March 16, 2010, was the Fit for Work evaluation that was done by a physical

therapist, and not a physical examination done by a doctor.  Further, the physical therapist did not report "unremarkable" findings.  See, Tr. 700-703.

A more fundamental flaw in the ALJ's discussion of the medical evidence is that he ignored or misunderstood the diagnosis of pain disorder.

After a consultative examination, state agency consultant Bruce Amble diagnosed pain disorder associated with both psychological factors and medical condition, mood disorder associated with health condition and adjustment disorder NOS.  (Tr. 396).  Dr. Pelzer, testifying as a psychological expert, noted those diagnoses.  (Tr. 30-33).  She was not asked whether she agreed with them.  The ALJ determined that Mr. Lumpkin had a "mood disorder," but did not discuss the diagnosis of pain disorder.  See, Tr. 15.

Pain disorder associated with both psychological factors and medical condition is recognized in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV).  It is a somatic disorder.  See, DSM-IV, §307.89.  The ALJ did not mention this diagnosis, which is distinct from the diagnosis of mood disorder.  This was error.  The ALJ was required to discuss all of the diagnoses indicated by Dr. Amble; if he rejected the diagnosis of pain disorder, he was required to explain why.  See, **Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2010)**, holding that the ALJ erred in failing to discuss diagnoses reached by psychologists who performed consultative examinations of the plaintiff.

The diagnosis of pain disorder is highly relevant to the determination of credibility:

> Pain is always subjective in the sense of being experienced in the brain. The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second.

*Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).

This Court is not suggesting that ALJ Vanderhoof was required to accept that Mr. Lumpkin suffers from pain disorder associated with both psychological factors and medical condition. While he certainly was not required to accept this evidence, he was required to confront it and "explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The failure to explain what he thought about the diagnosis leaves a gaping hole in the required "logical bridge from evidence to conclusion." *Vilano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.

Similarly, this Court is not suggesting that accepting the diagnosis of pain disorder associated with both psychological factors and medical condition would compel the conclusion that Mr. Lumpkin's allegations of disabling pain must also be accepted. It would not. **See,** *Carrdine*, *supra*. However, the ALJ's credibility determination rested in large part on his analysis of the medical evidence. Therefore, the failure to discuss the diagnosis of pain disorder renders the credibility analysis erroneous, and requires remand. However, it should be clear that this Court is not making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can only be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is, itself, a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, *Shalala v. Schaefer*, 509 U.S. 292, 296-298 (1993); *Perlman v. Swiss Bank Corporation Comprehensive Disability*

*Protection Plan*, **195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate. Upon remand pursuant to sentence four, judgment must be entered. *Shalala v. Schaefer*, **509 U.S. 292, 297-298 (1993)**.

### Conclusion

The Commissioner's final decision denying Ronnie L. Lumpkin's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATED:  October 17, 2012.

   s/ Clifford J. Proud
   **CLIFFORD J. PROUD**
   **UNITED STATES MAGISTRATE JUDGE**